By the Court. Woodruff, J.
—It is shown by receipts produced on the trial signed by the defendant himself, that he actually received certificates for one hundred and forty-six shares of the stock of the plaintiffs. His own testimony *455 shows, that, although he relied upon the promise of M. H. Mott, that he “would take care of it for” him, i. e., would take care of the number of shares exceeding eighty, yet, that he did in truth consent to the subscription therefor by Mott in his name, or sanctioned it after it was done, and the same having been subscribed, certificates were issued by the plaintiffs, and the defendant received them.
In the evidence bearing upon this branch of the case, that is to say, the history of the defendant’s ownership of the one hundred and forty-six shares, there is nothing whatever, showing any fraud or misrepresentation to induce him to subscribe or take the stock.
We have no hesitation in saying, therefore, that in this case, the defendant is to be treated (as between him and the plaintiffs) as the holder and owner of one hundred and forty- six shares of their capital 'stock. The fact that he had Mott's promise as to sixty-six shares, that he “would take care of it for him, does not, and cannot effect the plaintiffs. The language of the promise is itself vague and obscure ; it may mean that Mott would find a purchaser for it, or that he would procure some one to take it off his hands and pay for it, so that the defendant should not be required to do so. In some such sense as last stated, the defendant appears to have understood it. But it is obvious, that after the stock had been entered to the defendants’ name, and he had actually received the certificates therefor, he was (as against these plaintiffs, and as against Mott also,) entitled to hold it, and enjoy and exercise all the rights of a stockholder to the number of shares designated.
And in our judgment, it is equally certain, that he could not, as against these plaintiffs, have refused to pay the subscription price for the whole of the stock. Mott, in making the agreement referred to, was not the agent of the plaintiffs. He had no authority by virtue of his office of president to bind the plaintiffs, to an agreement, that a stockholder should not be required to pay for his stock. His promise was not in the plaintiffs’ name, nor ostensibly made on their behalf. It was in every aspect in form, in *456 fact, and in law, Mott’s individual promise to take care of the stock for the defendant, and upon that, the defendant must be deemed to have relied in authorizing or ratifying the subscription for the sixty-six shares exceeding the subscription for eighty shares, which the agreement did not embrace.
Had Mott assumed to act on behalf of the plaintiffs, and had promised for them, that the defendant should not be required to pay for the stock, they would not have been bound; first, because he had no authority to make such a contract; second, such an agreement on behalf of the corporation, to reduce a subscription to its stock, would be a fraud upon bona fide subscribers, contrary to public policy, and a fraud upon the statue, authorizing the creation of such corporations. It could not be tolerated that, in organizing and taking subscriptions for stock in corporations, formed under the statute, the proposed officers, or the officers actually agreed upon or appointed, should be permitted to contract with subscribers for stock, that they shall not .be required to pay in the amount subscribed.
The defendant is then to be treated in reference to the question before the court, as any other holder of one hundred and forty-six shares would be, or as he would be if the promise of Mott to take care of a part of his stock had not been made.
Again, the transfers subsequently made of the stock so held by the defendant, are to be deemed made upon his responsibility. They were made by him in person, or by his duly constituted attorney. His attorney is his representative, and not the plaintiffs’ agent. If, in either of the transfers, Mott made the transfer, which does not distinctly appear, he was not in that, acting as president of the plaintiffs ; it was no part of the power or duty of the president as such, to transfer the shares held by the shareholders, and any authority to him from a shareholder to make a transfer, was a private matter between the latter and the president, as a merely private individual. And such attorney, though at the time holding the office of president, *457 acts upon his private responsibility to the stockholder who gives him the authority. The corporation have no concern in or responsibility for the act of the president, in the exercise of such an authority.
If, therefore, the defendant thought proper to confide in Mott, so far as to give to him powers of attorney, or other general authority to control or sell, or transfer his stock, he made him his private agent, and he must look to him for indemnity for any transfer made in violation of any agreement with Mott, or not in conformity with the intention of the defendant. The transfers of stock which were made must, therefore, be treated (as between the plaintiffs and the defendant) as they would be, if made by the defendant in his own proper person.
In this view of these questions, which are in some part preliminary to the main question, how does the case appear ?
The defendant had received from the .plaintiffs on the 5th of August, 1852, a certificate for eighty shares of stock which belonged to him, and stood in his name upon the .plaintiffs’ books. He hypothecated those eighty shares (by delivery of the certificate with an assignment of the stock therein mentioned, and a power of attorney authorizing the transfer thereof) with the Knickerbocker Bank as security for two thousand dollars loaned to him upon the credit of his note so secured. He thereafter, on the 24th of August, 1852, received from the plaintiffs one certificate for twenty shares for B. F. Howe, (to whom he had transferred them,) and another for forty-six shares in his own name; these last two being the exact number of sixty-six shares which he claims Mott was to take care of, and the three making up the whole of his stock, viz: one hundred and forty-six shares.
By whose hands the certificate for the forty-six shares came to the possession of the Knickerbocker Bank, it is not distinctly shown; but it does appear that the defendant received it from the plaintiffs, and that it was delivered to the Knickerbocker Bank, with an assignment coupled with *458 a power of attorney to transfer the shares signed by the defendant, and that the bank surrendered the certificate for eighty shares theretofore held. The language of the defendant, after speaking of forty shares sold to his brother and Coleman, viz: “ the other forty shares were left with the bank as collateral security for my note,” sufficiently indicates that he was cognizant of this substitution, though he was perhaps mistaken in describing the last certificate as for forty, when it was for forty-six shares.
It thus appears that on and after the 24th of August, 1852, the defendant held one hundred and twenty-six shares of stock, and that forty-six of those shares were hypothecated with the Knickerbocker Bank as security for the defendant’s note. Afterwards, -and without surrendering the certificate for forty-six shares, the defendant transferred (in person or by attorney) one hundred and ten shares, and the question first arising is, whether that transfer destroyed the title of the Knickerbocker Bank to thirty of the forty-six shares for which they held a certificate ?
Without considering that precise question, it will, perhaps, be sufficient to consider whether the defendant was, after the transfer of- the one hundred and ten shares, under any responsibility in respect of the deficiency thus created.
On this subject, two propositions are, we think, clear: First. His transfer was a violation of the rights of the Knickerbocker Bank. Although (the transfer being made by his attorney) if he did not knowingly consent to it, he was guilty of no intentional wrong" the transfer was a fraud upon the bank, and he was bound to make them good. In equity, they had against him a clear title to have those shares, and to compel him to remove all impediments to their appropriation to the purpose for which they were held, or to pay them the full value thereof. And, Second. He was under the like obligation to return the certificate for forty-six shares to the plaintiffs, or at least to indemify them against any claim under the same by reason of his own previous assignment thereof to the bank. The plaintiffs might, perhaps, so far waive the return of *459 the certificate and permit a transfer as to give to the transferee receiving a transfer and certificate in good faith, in his own name, a valid title as against them to the number of shares so transferred; but if so, that would not waive a claim upon the defendant either to return the outstanding certificate or indemnify them against it.
It follows that the defendant, after the transfer by which his stock was reduced to sixteen shares, was under a clear liability to the Knickerbocker Bank to the extent of the value of the thirty shares, and to the plaintiffs to indemnify them against any claim on account thereof.
We think, moreover, that inasmuch as the president, Mott, and the defendant, a director, were both fully aware that the stock had been hypothecated with the Knickerbocker Bank, where the transfer was made which reduced his shares' to sixteen, it was by no means clear that the plaintiffs could have protected themselves against the demand of the bank, or its receiver or assignee, to recognize their title and permit a transfer thereof; or if, by reason of the transfer already made in fraud of the rights of the bank an actual recognition of the title of the bank, was impossible, because it would increase the number of shares beyond the number of actual shares of its capital, then it is not clear that the plaintiffs were not bound to indemnify the bank or its assignee.
Be this as it may, the plaintiffs consented to give such indemnity by refunding to the purchaser the sum he paid for the thirty shares. That sum had been applied in discharge of the conceded indebtedness of the defendant to the Knickerbocker Bank, and the defendant sanctioned that application, and so indirectly received to his own use the precise amount which the plaintiffs had paid.
The claim, therefore, which the purchaser made upon the plaintiffs for the thirty shares under and by virtue of the defendant’s assignment and power, may properly be treated as a request by the defendant addressed to the plaintiffs to deliver to such purchaser thirty shares of stock, and the payment of its value (under the circum *460 stances) as an equivalent, as the payment of so much money to his use. Had not the plaintiffs acceded to such request, the purchaser would have had recourse to the defendant, and it is not for the latter to object that the plaintiffs did not engage in a litigation with such purchaser before doing what the defendant’s assignment and power of attorney, as against him, authorized them to do.
But, in our judgment, the subsequent promise of the defendant, which was clearly proved, to repay the money, removes all doubt on the subject. The defendant was liable to that very amount to the bank or to the purchaser, and the payment by the plaintiffs operated to discharge him to that extent. It was paid by the plaintiffs, and. on notice thereof, he agreed to refund the amount paid.
We think it was not a merely voluntary payment under the circumstances in which the plaintiffs were placed. That it may properly be deemed, as already suggested, a payment by his request. But especially, that it was a payment for his benefit in discharge of a plain liability which he was under to a corresponding amount, (the sum paid by the purchaser having been, with his assent, applied to his debt, and so he having unequivocally sanctioned the sale,) and that this was a good and sufficient consideration for his agreement to refund the amount paid. (See Stewart v. Eden, 2 Caines, 152 ; Comstock v. Smith, 7 J. R. 86 ; Hicks v. Burhans, 10 Id. 243; Beach v. Vandenburgh, Id. 360 ; Everts v. Adams, 12 Id. 352 ; Oatfield v. Waring, 14 Id. 191; Doty v. Wilson, Id. 381; Gourley v. Allen, 5 Cow. 644 ; Forsyth v. Ganson, 5 Wend. 558 ; Addison on Conts. 19, 20 ; Story on Conts. § 473; Parsons on Mer. Law, 39, 40 ; Wing v. Mill, 1 Barn. & Ald. 104. See also Miller v. Watson, 4 Wend. 267; Russell v. Cook, 3 Hill, 504.)
For these reasons, we think that upon the facts proved the defendant was liable, and that the non-suit ordered at the trial was erroneous.
• A new trial should be ordered, with costs to abide the event of the suit.
Ordered accordingly.